**Jocelyn WHIDBEE, Shirlene Tranquille, Plaintiffs–Appellants,**

v.

**GARZARELLI FOOD SPECIALTIES, INC., Ed and John Garzarelli, Owners, Defendants–Appellees.**

**Docket No. 99–9470.**

United States Court of Appeals, Second Circuit.

Argued: June 8, 2000

Decided: Aug. 14, 2000

Stephen Bergstein, Law Office of Michael H. Sussman, Goshen, N.Y. (Michael H. Sussman, on the brief), for Plaintiffs–Appellants.

Michael P. Pappas, Roberts & Finger, New York, N.Y. (Joel L. Finger, on the brief), for Defendants–Appellees.

Before: OAKES, NEWMAN, and STRAUB, Circuit Judges.

STRAUB, Circuit Judge:

Plaintiffs Jocelyn Whidbee and Shirlene Tranquille appeal from a grant of summary judgment in favor of the defendants, Garzarelli Food Specialties ("GFS") and Ed and John Garzarelli, by the United States District Court for the Southern District of New York (Colleen McMahon, *Judge*).

Whidbee and Tranquille were employed at a McDonald's Restaurant franchise in Middletown, New York, owned and operated by GFS. They brought claims against GFS and its owners, Ed and John Garza-

relli, alleging employment discrimination under 42 U.S.C. § 1981 and New York state law.[1]

The District Court granted the defendants' motion for summary judgment, finding that the plaintiffs had failed to demonstrate a question of fact as to the existence of a hostile work environment, constructive discharge, and individual liability on the part of the franchise owners, and were precluded from bringing their state law claims because they had filed administrative charges against the defendants with the New York State Division of Human Rights.

For the reasons given below, we conclude that the plaintiffs presented sufficient evidence of a hostile work environment and of employer liability to survive summary judgment. We also find that the plaintiffs' state law claims are not precluded because the New York State Division of Human Rights dismissed the plaintiffs' complaints on the grounds of administrative convenience. We agree, however, that the plaintiffs failed to demonstrate constructive discharge and individual liability on the part of the franchise owners.

Accordingly, we affirm in part, vacate in part, and remand for further proceedings.

## BACKGROUND

Taking the plaintiffs' allegations to be true, as we must on review of a grant of summary judgment, see Distasio v. Perkin Elmer Corp., 157 F.3d 55, 64 (2d Cir.1998); In re IBM Corp. Sec. Litig., 163 F.3d 102, 109 (2d Cir.1998), the record reveals the following events.

1. The plaintiffs initially sued McDonald's Corporation, and McDonald's is thus listed as a party in the District Court's captions. By stipulation, McDonald's was dismissed as a party to the action, and therefore we have omitted McDonald's from the caption in this Court.

2. The plaintiffs allege several incidents of harassment that were reported to them by other employees. They did not, however, submit affidavits by those employees in support of their motion opposing summary judgment.

In late 1997, Jocelyn Whidbee and Shirlene Tranquille, both of whom are African-American, began working at a McDonald's Restaurant franchise in Middletown, New York, owned and operated by GFS. Beginning in April 1998, they were subjected to racially offensive comments made by a co-worker, Richard Corliss, that lasted until their resignations in June 1998.[2]

In April or May of 1998, Corliss told Tranquille while they were having lunch in the restaurant's break room that "Puerto Ricans are harder workers than Mexicans"; that another co-worker, who is Mexican, "smelled"; that he "had a problem with Mexicans"; that "Middletown was getting worse because of the blacks and the Puerto Ricans," who "are bringing down Middletown"; and that "blacks need to stop with the slang." Again in May, Corliss told Tranquille that "Blacks and Puerto Ricans are lazy and don't want to work."

In early June, the plaintiffs overheard Corliss telling another co-worker, Jamie Hunter, that Hunter is a "lazy black boy" because he does not "like to work" and that Corliss had a "rope in the back shed to hang [Hunter's] butt."

On June 8, the plaintiffs complained to their supervisors. They initially approached Tina Hanley; Hanley steered the plaintiffs to general manager Patrick Grable. The plaintiffs informed Grable that Corliss had directed racist statements toward them and other McDonald's employees during the two preceding months. The plaintiffs claim that Grable told

The District Court nonetheless considered those incidents in evaluating the plaintiffs' evidence. While we decline to decide whether the reported incidents constitute hearsay or whether the defendants waived any claim that they are hearsay, on this appeal we do not consider those allegations about which the plaintiffs appear to lack personal knowledge because we find that the plaintiffs' claims survive summary judgment even without those allegations.

Tranquille that she would have to handle the problem herself; the defendants claim that Grable told the plaintiffs that he would speak to Corliss. Regardless, it is undisputed that Grable did not speak to Corliss on June 8.

On June 9, Tranquille heard Corliss refer to Hunter as a "lazy black snake." The plaintiffs immediately complained again to Grable, and Grable assured them that he would speak to Corliss. Grable avers that he intended to speak to Corliss that day, but that Corliss had already left for the day before he had an opportunity to do so. The next day, June 10, both Corliss and Grable were not at the restaurant all day, and on June 11, Grable was off. Grable did not speak to either the store owners or the other managers about the matter.

On approximately June 10, Whidbee and Tranquille submitted notices of resignation, effective June 23.[3] The plaintiffs stated that part of their reason for resigning was the racial tension at work, but Whidbee also acknowledged that she wished to apply for work closer to home.

On June 11, while Grable was still away from the restaurant, Corliss called both Whidbee and Tranquille "black sheep." The plaintiffs immediately complained to Hanley. Hanley did nothing on June 11, but reported the incident to Grable when he returned to work on June 12.

On the morning of June 12, Whidbee asked Grable to meet with her, but Grable said he was too busy and had to take care of other things. Later that day, however, after Hanley reported the "black sheep" incident, Grable apparently met with Corliss and gave him a verbal warning.

On June 16, the plaintiffs met with Grable.[4] The plaintiffs tape recorded the meeting without Grable's knowledge. At the meeting, the plaintiffs reported another comment Corliss had recently made to a co-worker—Corliss allegedly said that he "still can't stand black folk"—and cited his continued slurs as the reason for their resignations. Grable replied that he "can't control [Corliss's] mouth"; that if the plaintiffs have a personal problem with Corliss "maybe [they] should approach him" themselves; that he does not "know how to deal with" the problem and does not "want to deal with it" because it is "just too much" for him; and that if talking to Corliss by either Grable or the plaintiffs does not solve the problem, then the plaintiffs "have to leave." When the plaintiffs mentioned that their job applications promised "no discrimination," Grable responded, "That's McDonald's, no discrimination[;] [Corliss] is not McDonald's." Grable also told the plaintiffs that he had a picture of Diana Ross in the back seat of his car and that in his view "the white people should have stayed out of Africa and not brought the people over here, but we can't change that." Grable then opined that the "whole thing is being blown out of proportion."

In the meeting Grable also said that he and the plaintiffs should meet with Corliss, and that Corliss "either [has] got to stop saying it or he has to quit." Grable stated that he would have "to do some research through McDonald's, too, to find out exactly ... which way I should handle this, if it can't be stopped."

Regarding their two-week resignation notices, Grable asked the plaintiffs if they had changed their minds. Whidbee replied, "[I]f it's gonna keep going on, I'm not gonna stay." She also said that she would think about staying at the Middletown franchise, but that another franchise is closer to her home and working there

---

**3.** In her deposition, Whidbee said she gave notice on June 12. The brief submitted to this Court on behalf of Whidbee and Tranquille and the District Court's decision, however, both list the date as June 10.

**4.** There is some disagreement as to the exact date of the meeting, and as to whether Corliss was present at the meeting. The District Court assumed that the meeting occurred on June 16.

would allow her to spend more time with her son.

After the meeting on June 16, Grable issued Corliss a written warning, stating that any further offensive conduct would result in disciplinary measures, up to and including termination. Notwithstanding this warning, Corliss continued to make offensive comments. As Whidbee testified at her deposition, on June 17 or 18 Corliss discussed the incident in Texas in which an African–American man was dragged to his death from a pick-up truck. Corliss told Hunter that Corliss "should go out and buy a truck and drag someone by the truck who is black," and then told Tranquille that the victim must have provoked his killers. Corliss also commented that "Al Sharpton [is] basically a rich, black man trying to make money off of lies."

On June 26, Whidbee met with Patrick Grable, McDonald's District Supervisor Diane Grable, and Corliss. Corliss apologized to Whidbee, and Patrick and Diane Grable told Corliss that he could not continue to make offensive comments and that he would be terminated if he did continue.

Nonetheless, Whidbee and Tranquille left McDonald's employ on June 26, 1998. They brought this action in October 1998. In November 1999, the District Court granted the defendants' motion for summary judgment.

This timely appeal followed.

## DISCUSSION

■ At the outset, we address a threshold issue that the District Court found unnecessary to reach—whether the plaintiffs, as at-will employees, can maintain causes of action under 42 U.S.C. § 1981, which outlaws discrimination with regard to the enjoyment of all benefits, privileges, terms, and conditions of a contractual relationship.

The question whether a contract can be said to exist for § 1981 purposes between at-will employees and their employers was very recently considered by this Court in *Lauture v. IBM,* 216 F.3d 258 (2d Cir. 2000). We held in *Lauture* that an at-will employment agreement governed by New York law constitutes a "contract" within the meaning of 42 U.S.C. § 1981. *See* 216 F.3d at 261–62. Thus, the plaintiffs here can maintain their claims under § 1981.

■ Turning to the merits, we review a district court's grant of summary judgment *de novo,* construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. *See Maguire v. Citicorp Retail Servs., Inc.,* 147 F.3d 232, 235 (2d Cir.1998). We will affirm a district court's decision to grant summary judgment if the record indicates that " 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting Fed.R.Civ.P. 56(c)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

## I. *42 U.S.C. § 1981*

### A. *Hostile Work Environment*

■ Title 42, section 1981 of the United States Code provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, . . . .

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

Section 1981 provides a cause of action for race-based employment discrimination based on a hostile work environment.[5] *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987). As under Title VII, "[a] hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive." *Id.; see also Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 347 n. 2 (7th Cir.) ("In analyzing § 1981 claims, we apply the same standards as in Title VII cases."), *cert. denied,* ─── U.S. ───, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999). "In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (internal quotation marks omitted).

■ Incidents that are "few in number" and that occur "over a short period of time" may fail to demonstrate a hostile work environment. *Lopez,* 831 F.2d at 1189; *see Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) ("[i]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments" (internal quotation marks omitted)). At the same time, "[i]t is not how long the sexual innuendos, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive." *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 578 (2d Cir.1989).[6]

■ To withstand summary judgment, a "plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz,* 202 F.3d at 570 (internal quotation marks omitted). In the end, "[d]etermining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances." *Id.*

■ The District Court here concluded that "the facts in the present case are simply too far removed from the level of severity or pervasiveness required by [the Second Circuit] to establish the existence of a hostile environment." We cannot agree. In concluding that the plaintiffs had failed to demonstrate the existence of a hostile work environment, the District Court appears to have analyzed the alleged incidents of harassment without looking at the totality of the circumstances.

■ First, the court found "noteworthy" the fact that all but one of Corliss's remarks were made with reference to employees other than the plaintiffs. We have specifically held, however, that "[b]ecause the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Id.; see also Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir.1997) ("Since one of the critical inquiries with respect to a hos-

---

**5.** In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that actions for discrimination or harassment in employment are not cognizable under § 1981 because such harassment occurs after the formation of a contract. The Civil Rights Act of 1991 added section (b)—regarding the performance and enjoyment of contracts—to § 1981 for the express purpose of overruling *Patter-*

son. *See* Civil Rights Act of 1991, § 3, Pub.L. No. 102–166, 105 Stat. 1071.

**6.** *Carrero* is a sex discrimination case, but "the same standards apply to both race-based and sex-based hostile environment claims." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 n. 2 (2d Cir. 1999).

tile environment claim is the nature of the environment itself, evidence of the general work atmosphere is relevant.").

Second, it may be true, as the District Court observed, that the harassment here was not as severe as that in many other cases. We have reminded district courts, however, that "the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 439 (2d Cir.1999) (internal quotation marks omitted). "[T]here is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Id.* (internal quotation marks omitted).

■ Third, the District Court held that Corliss's conduct was not severe or pervasive because it did not render the plaintiffs' jobs "unendurable" or "intolerable." The bar is not set so high, however. While a mild, isolated incident does not make a work environment hostile, the test is whether "the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*" *Torres v. Pisano*, 116 F.3d 625, 632 (2d Cir.) (emphasis added), *cert. denied*, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). "The fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Id.* at 631; *cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22,

114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (employee's psychological well-being need not be affected in order to find a hostile work environment).

■ Fourth, we disagree with the District Court's decision to accord less significance to incidents that occurred after June 10, the approximate date on which the plaintiffs submitted their notices of resignation. We find the comments made after June 10 to be quite relevant. For one thing, while the plaintiffs had conveyed their intention to resign, they could have reconsidered. In fact, the record suggests that both the plaintiffs and Grable considered the possibility that the plaintiffs might withdraw their notices.[7] Moreover, even if the plaintiffs had decided to leave McDonald's, they were still a part of the work environment until the date they actually left. Hostility in that environment should not be tolerated simply because the plaintiffs had communicated an intention to resign. Employees often provide several months' notice of resignation; courts cannot ignore incidents of harassment that occur in the months before the employee actually leaves.[8] Furthermore, the comments made after the plaintiffs submitted their notices are relevant in evaluating the severity of the pre-notice comments.

■ An examination of the totality of the circumstances here shows that the plaintiffs were subjected to, or at the very least aware of, a stream of racially offensive comments over the span of two to three months. On one day Corliss delivered a veritable barrage of racial epithets.[9] At least one comment—Corliss said he had a rope with which to hang a co-worker—

7. Indeed, comments made by Grable in the June 16 meeting suggest that he intended to include the plaintiffs on the work schedule for the following week despite the fact that they had submitted their notices of resignation.

8. The District Court's logic puts plaintiffs in a "Catch–22." If they submit a notice of resignation as a result of a hostile work environment, any harassment that occurs after that notice will be discounted. But if they delay in

submitting a notice of resignation, they may be forced to endure continued harassment.

9. To be actionable, offensive remarks or behavior need not "be directed at individuals who are members of the plaintiff's own protected class. Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee." *Cruz*, 202 F.3d at 570.

was physically threatening. To be sure, even including the post-notice period, the duration of the hostile environment here was shorter than in many other discrimination cases. The question, however, is whether, given the totality of the circumstances, it can be said as a matter of law that the plaintiffs' work environment was not negatively impacted by Corliss's comments. Here, as in *Richardson*, "[r]easonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee. But the potential for such disagreement renders summary judgment inappropriate." 180 F.3d at 439; *see Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 87 (2d Cir.1996) ("[T]rial courts must be especially chary in handing out summary judgment in discrimination cases...."). Therefore, we find that the plaintiffs presented sufficient evidence of a hostile work environment to survive summary judgment.

■■■ Finally, we find it necessary to address the District Court's treatment of the alleged incidents of harassment that occurred outside the presence of the plaintiffs. The plaintiffs failed to include affidavits from their co-workers as to incidents that occurred outside their presence. The District Court considered those incidents and concluded that they were not probative because the plaintiffs were not present. That conclusion is at odds with our precedent.

In *Schwapp*, we held that "[t]he mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim" because "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment." 118 F.3d at 111. *See also Cruz*, 202 F.3d at 571 (finding that, even if plaintiff were not present when some comments were made, "a jury plausibly could find that [defendant's] persistently offensive conduct created an overall hostile or abusive environment" which "exacerbated the effect of the harassment [plaintiff] experienced individually" (internal quotation marks and citations omitted)).

■■■ The District Court cited *Schwapp* for the proposition that second-hand comments are of less probative value than comments perceived by a plaintiff directly. The court, however, apparently disregarded *Schwapp's* central point, which is that such a determination of probative value is not appropriate on summary judgment:

> [T]he incidents relating to other minorities and those occurring before [plaintiff's] tenure may be of limited probative value, *but cannot be ignored on summary judgment.* Whether [plaintiff] was aware of them during his employment, and, more significantly, whether in light of these incidents, the incidents [plaintiff] experienced more directly "would reasonably be perceived, and [were] perceived, as hostile or abusive," *are factual issues that should be resolved by a trier of fact.*

*Schwapp*, 118 F.3d at 112 (quoting *Harris*, 510 U.S. at 22, 114 S.Ct. 367) (emphasis added). Thus, having decided to consider the co-workers' statements, the District Court erred in ruling that they had no probative value.

Of course, while second-hand comments may be relevant, a district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions. *See Schwapp*, 118 F.3d at 111 (bald assertions not based on personal knowledge were properly ignored by district court in granting summary judgment). Thus, it is possible that the statements reported to the plaintiffs and not supported by affidavits are inadmissible hearsay. *See Howley v. Town of Stratford*, 217 F.3d 141, 154–55 (2d Cir.2000) (testimony by plaintiff that other co-workers told her of certain harassing statements likely inadmissible to prove that the

statements were actually made). Accordingly, on this appeal we did not consider those allegations that may constitute hearsay because we found sufficient admissible evidence to preclude summary judgment. *See id.* at 156 (disregarding hearsay statements but finding sufficient admissible evidence to prevent summary dismissal of plaintiff's hostile work environment claim).

### B. *Employer Liability*

■ To prevail on their § 1981 claims the plaintiffs must show not only severe or pervasive harassment but also "a specific basis ... for imputing the conduct that created the hostile environment to the employer." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996). Because the harassment here was by a co-worker and not a supervisor, the plaintiffs must demonstrate that GFS "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* (internal quotation marks omitted). "[A]n employer will be liable in negligence for a racially ... hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action." *Richardson,* 180 F.3d at 446 (citing *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)); *see Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998).

■ "[O]nce an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it." *Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2d Cir.1986). The reasonableness of GFS's response is a close call. The record suggests that Patrick Grable was inadequately prepared to deal with workplace harassment and insufficiently sympathetic to the plaintiffs' complaints. He told the plaintiffs that if Corliss's conduct does not stop then they may have to leave; he admitted a lack of knowledge as to McDonald's policy on workplace harassment; and he trivialized the plaintiffs' concerns. At the same time, Grable did give Corliss a verbal warning four days after receiving the plaintiffs' complaint and a written warning eight days after the complaint. Several days later he warned Corliss again that if he used racially offensive language he would be terminated.

The District Court found that the plaintiffs did not show that the measures taken by the defendants were not reasonably likely to stop Corliss's harassment. Nonetheless, apparently heeding our admonition that "[w]hether an employer has fulfilled his responsibility in this regard is to be determined upon the facts in each case," *Snell,* 782 F.2d at 1104, the court held that if it had found sufficient evidence of a hostile work environment, it would have allowed the case to go to trial on the reasonableness of GFS's response to the plaintiffs' complaints. The court found telling the fact that Corliss's conduct did not in fact stop.

■ To be sure, "[a]n employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct." *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 295 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000). However, we have held that if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate. *See Richardson,* 180 F.3d at 442; *see also Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999) ("Factors in assessing the reasonableness of remedial measures may include ... whether or not the measures ended the harassment." (internal citations omitted)).

In *Richardson* we reversed a grant of summary judgment even though the employer "immediately" responded to some of the plaintiff's complaints, since there were other incidents in response to which the

employer took no action and the harassment continued after the plaintiff made her complaints. *See* 180 F.3d at 441–42. "If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Id.* at 441 (internal quotation marks omitted).

■ Likewise, here, it appears in the last analysis that reasonable jurors could disagree as to whether GFS's response was effective and prompt. Certainly, GFS is not required to prove that its response was totally successful; but at this stage of the litigation we cannot say that the plaintiffs failed to produce evidence that GFS was dilatory in its response to Corliss's behavior. Moreover, Grable's vacillations could have left the plaintiffs "feeling chastened and even less inclined to press [their] complaint[s], and thus even more compromised in [their] ability to perform unimpeded the tasks and responsibilities for which [they were] hired." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1368 (11th Cir.1999) (Barkett, J., concurring specially). A reasonable jury could find that Grable's initial inaction "inflict[ed] harm on the victim[s] that is as real as if the supervisor were doing the harassing." *Id.* (Barkett, J., concurring specially). Especially in light of the conflicting statements made by Grable, and the disputed issues regarding the discussions in the various meetings, we conclude that summary judgment on this issue would be inappropriate.

## II. *Constructive Discharge*

The plaintiffs also argue that summary judgment was inappropriate as to their claims that they were constructively discharged as a result of their allegedly hostile work environment and the failure of the defendants to take adequate remedial measures with respect to their complaints.

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova*, 92 F.3d at 89 (internal quotation marks and citation omitted); *see Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir.1987) ("A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (internal quotation marks omitted)).

■ To find that an employee's resignation amounted to a constructive discharge, "the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lopez*, 831 F.2d at 1188 (internal quotation marks omitted).

Our conclusion that summary judgment was inappropriate on the plaintiffs' hostile environment and employer liability claims could lead us to conclude that it was likewise inappropriate on their constructive discharge claims. *See Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir.1997) (noting that hostile work environment facts support other claims, including constructive discharge); *Kimzey v. Wal–Mart Stores, Inc.*, 107 F.3d 568, 574–75 (8th Cir.1997) (observing that continuing sexual harassment combined with management's indifference could cause reasonable jury to find constructive discharge).

On the other hand, at least one district court in this Circuit has held that the level of conduct sufficient to demonstrate a hostile work environment is not necessarily sufficient to demonstrate constructive discharge. *See Ternullo v. Reno*, 8 F.Supp.2d 186, 192 (N.D.N.Y.1998) ("[T]his Court has held that to demonstrate constructive discharge, the plaintiff must demonstrate harassment that is more severe

and pervasive than that required to show a hostile work environment.").

■ We need not decide that question, however, because constructive discharge also requires deliberate action on the part of the employer. While the meaning of "deliberate" in this context is unsettled, *see Kader v. Paper Software, Inc.,* 111 F.3d 337, 340 (2d Cir.1997) ("Neither our cases nor New York law have examined what relationship between deliberateness and the intolerability of working conditions is required to constitute constructive discharge."); *Ternullo,* 8 F.Supp.2d at 191 (noting disagreement in Second Circuit between cases requiring intent to force employee into quitting and cases requiring no such specific intent), our case law indicates that something beyond mere negligence or ineffectiveness is required. *See, e.g., Kader,* 111 F.3d at 341 ("[Plaintiff] has demonstrated that an uneasy and stressful environment existed, but he has adduced no evidence to support an inference that his employer intentionally created an intolerable workplace."); *Chertkova,* 92 F.3d at 89 (finding constructive discharge where "supervisor engaged in a pattern of baseless criticisms, said [plaintiff] would not 'be around,' and that [plaintiff] would be fired instantly if she did not meet certain ambiguous behavior objectives"); *Lopez,* 831 F.2d at 1188 (finding evidence of constructive discharge because supervisor told employer "he would be fired at the end of [a] probationary period no matter what he did to improve his allegedly deficient performance").

■ Certain statements by Grable—such as his comment that if Corliss's behavior does not stop then the plaintiffs may have to leave—might be seen as evincing a lack of concern about the plaintiffs' situation. However, regardless of the exact definition of deliberateness, even this evidence does not support an inference that GFS intended to create intolerable workplace conditions. Indeed, Grable demonstrated an interest in retaining the plaintiffs. *See Pena v. Brattleboro Re-*

*treat,* 702 F.2d 322, 325 (2d Cir.1983) (finding no constructive discharge in part because evidence showed that defendant wanted employee to remain in its employ). As ineffective or even incompetent as Grable's handling of the matter may have been, it does not rise to the level of deliberate action required by our precedent.

Because we find no evidence that GFS or its managers "intentionally create[d] an intolerable work atmosphere that force[d] an employee to quit involuntarily," *Chertkova,* 92 F.3d at 89, we affirm the District Court's grant of summary judgment on the plaintiffs' constructive discharge claims.

## III. *Individual Liability of the Garzarellis*

The plaintiffs also assert that summary judgment was improper as to their § 1981 claims against Ed and John Garzarelli, the owners and principal shareholders of the McDonald's franchise, in their individual capacities.

This Court has not previously decided whether § 1981 provides for personal liability. In *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995), we held that individuals may not be held personally liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The dissent in *Tomka* argued against that holding, in part by pointing out that "employers and agents of those employers face unlimited civil liability for similar discriminatory acts under 42 U.S.C. § 1981 . . . ." *Id.* at 1323 (Parker, J., dissenting). Accepting this proposition as true, the *Tomka* majority noted the "breadth" of § 1981's statutory scheme, but found that in light of the "significant differences in the statutory enforcement mechanism, coverage, and remedial provisions of § 1981, as distinguished from Title VII," Title VII may not countenance personal liability. *Id.* at 1316–17. Thus, *Tomka* appears at least implicitly to recognize individual liability under § 1981. *See Hicks v. IBM,* 44 F.Supp.2d 593, 596–97 (S.D.N.Y.1999)

("[T]he [*Tomka*] court's analysis of the distinction between Title VII and § 1981 and its affirmation of the 'breadth' of the latter, strongly suggest that individuals can be held liable under § 1981.").

Moreover, several of our sister circuits have held that individuals can be sued under § 1981. *See, e.g., Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 983 (10th Cir.1991) (apparently assuming § 1981 allows individual liability but finding no evidence of personal involvement); *Jones v. Continental Corp.,* 789 F.2d 1225, 1231 (6th Cir.1986) ("[T]he law is clear that individuals may be held liable for violations of § 1981. . . ."); *Faraca v. Clements,* 506 F.2d 956, 959 (5th Cir.), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975). Likewise, district courts in this and other circuits have allowed individual liability under § 1981. *See, e.g., Hicks,* 44 F.Supp.2d at 596–97; *Amin v. Quad/Graphics, Inc.,* 929 F.Supp. 73, 78 (N.D.N.Y.1996); *O'Connor v. 11 W. 30th St. Rest. Corp.,* Nos. 94 Civ. 2951, 93 Civ. 8895, 1995 WL 354904, at *7 (S.D.N.Y. June 13, 1995); *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky,* 59 F.Supp.2d 27, 33 (D.D.C.1999).

■ We now explicitly hold what was implicit in our previous cases: individuals may be held liable under § 1981. We agree with the Tenth Circuit, however, that in order to make out a claim for individual liability under § 1981, a plaintiff must demonstrate "some affirmative link to causally connect the actor with the discriminatory action." *Allen,* 928 F.2d at 983. "A claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement." *Id.; see also Hicks,* 44 F.Supp.2d at 597 ("In each of the cases that have allowed individual liability [under § 1981], the individuals have been supervisors who were personally involved in the discriminatory activity.").

■ Here, the District Court correctly held that the plaintiffs made no showing of a causal relationship between the Garza-rellis and the harassment the plaintiffs suffered from Corliss. At most, the Garzarellis were negligent in maintaining their restaurant's anti-discrimination policy. Even if this were the case, such negligence does not constitute the "personal involvement" or "affirmative link" necessary to support a claim of individual liability.

Accordingly, we affirm the dismissal of the plaintiffs' § 1981 claims against the Garzarellis individually.

## IV. *New York State Law Claims*

■ The plaintiffs also asserted pendent claims under New York Executive Law §§ 296 and 297, which prohibit unlawful discriminatory practices. Subsection 9 of § 297 provides a cause of action to any person claiming to be aggrieved by an unlawful discriminatory practice. That same subsection, however, precludes a cause of action if the person has filed a complaint with any local commission on human rights. We hold that the prohibition against filing in state court after a complaint has been filed with the Division of Human Rights applies to state law claims in federal courts as well. *See, e.g., Wiesman v. Metropolitan Museum of Art,* 772 F.Supp. 817, 819 (S.D.N.Y.1991).

■ The plaintiffs filed administrative charges against the defendants with the New York State Division of Human Rights in August 1998. For this reason, the District Court dismissed the plaintiffs' claims under §§ 296 and 297.

Subsection 9 of § 297 provides, however, that "where the [Division of Human Rights] has dismissed such complaint on the grounds of administrative convenience, . . . [the] person shall maintain all rights to bring suit as if no complaint had been filed with the division." N.Y. Exec. Law § 297(9) (McKinney 1999). Moreover, § 297(9) provides that

[a]t any time prior to a hearing . . ., a person who has a complaint pending at the division may request that the division dismiss the complaint and annul his or her election of remedies so that the

human rights law claim may be pursued in court, and the division may, upon such request, dismiss the complaint on the grounds that such person's election of an administrative remedy is annulled.

*Id.*

It is undisputed that in July 1999—prior to any hearing—the plaintiffs requested and received dismissals of their Division of Human Rights complaints based on administrative convenience. And though the District Court was made aware of the dismissals at oral argument on the summary judgment motion, the court nonetheless found that the plaintiffs "submitted no evidence ... that the Division [of Human Rights] has made any disposition of those charges." The court thus dismissed the plaintiffs' claims without further comment. Because the plaintiffs obtained administrative dismissals of their claims, and obtained them prior to the District Court's decision, we find that the court erred in granting the defendants' summary judgment motion.

The defendants now argue that the administrative dismissals should not be given effect because they were inappropriately issued. In support of this assertion, the defendants cite three cases that stand for the proposition that an administrative dismissal is inappropriately issued where the dismissal is related to a party's change in litigation strategy rather than true administrative convenience.[10] These cases, however, were decided, or involved events that occurred, before August 1997, when § 297(9) was amended to add the provision quoted above allowing a complainant to request a dismissal at any time prior to a hearing.[11] *See* 1997 N.Y. Laws Ch. 374.

Section 297(9) as amended appears to allow just what the plaintiffs did here—they requested a dismissal in order to

pursue their claims in court. Nothing in the statute precludes an administrative dismissal where a plaintiff seeks to change her litigation strategy. *See Sprott v. New York City Housing Auth.,* No. 94 Civ. 3818, 1999 WL 1206678, at *2–*3 (S.D.N.Y. Dec.16, 1999) (noting that amended § 297(9) "clearly permits" request for administrative dismissal to pursue claims in court, but dismissing claims as time barred). Accordingly, the plaintiffs' state law claims should be reinstated.

## CONCLUSION

For the foregoing reasons, we affirm the dismissal of the plaintiffs' constructive discharge claims and their claims against the Garzarellis individually, but we vacate the dismissal of the plaintiffs' 42 U.S.C. § 1981 hostile environment claims and claims under New York Executive Law §§ 296 and 297. We accordingly remand for further proceedings. Each party shall bear its own costs on this appeal.

---

10. The defendants cite *Pugh v. Memorial Sloan Kettering Cancer Ctr.,* No. 97 Civ. 8594, 1998 WL 158764 (S.D.N.Y. Apr.6, 1998); *Chachra v. Katharine Gibbs School, Inc.,* 828 F.Supp. 176 (E.D.N.Y.1993); and *Marine Midland Bank, N.A. v. New York State Div. of Human Rights,* 75 N.Y.2d 240, 551 N.E.2d 558, 552 N.Y.S.2d 65 (1989).

11. *Pugh,* 1998 WL 158764, was decided after amended § 297(9) went into effect, but the plaintiff in that case filed his complaint with the Division of Human Rights in 1991, and the court refused to apply amendments to § 297 that went into effect after the plaintiff's filing. *See id.* at *2 n. 1.