**Gail WHITRIGHT, Plaintiff,**

v.

**HARTFORD PUBLIC SCHOOLS, Defendant.**

**No. 3:06cv1272 (MRK).**

United States District Court, D. Connecticut.

April 16, 2008.

---

Eugene N. Axelrod, Axelrod & Associates, LLC., Woodbridge, CT, for Plaintiff.

Ann F. Bird, Bird and Apostolidis, Middletown, CT, for Defendant.

## RULING AND ORDER

MARK R. KRAVITZ, District Judge.

Pending before the Court is Hartford Public Schools' ("HPS") Motion for Summary Judgment [doc. # 20]. HPS requests summary judgment on Gail Whitright's Complaint [doc. # 1], which in counts one and four, alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964 and its State counterpart, Connecticut General Statute § 46a–60(a)(1); in counts two and six, alleges a hostile work environment in violation of Title VII and Connecticut General Statute § 46a–60(a)(1); and in counts three and five, alleges retaliation in violation of Title VII and Connecticut General Statute § 46a–60(a)(4). Ms. Whitright initially pleaded a seventh count alleging a violation of Connecticut General Statute §§ 46a–99 and 46a–70(a) but later withdrew that claim. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [doc. # 25] at 22. Thus, the Court grants summary judgment to HPS on count seven. In addition, for the reasons discussed below, the Court also grants summary judgment to HPS on counts one, three, four and five, but denies summary judgment on counts two and six.

### I.

The basic facts of this case are not in serious dispute. Ms. Whitright is Caucasian, and from late 2004 through June 2005 when she retired, was a teacher at the Annie Fisher School, a Hartford Public School. During most of her tenure at the Fisher School, Ms. Whitright had responsibility for a pre-kindergarten morning class, and was assisted in her class duties by several individuals including Mrs. Harper, a Child Development Assistant ("CDA"), and Ms. Parnell, a paraprofessional. For a period of time, Mr. Rodri-

guez, a CDA, assisted in the afternoon class. Mrs. Morris is Fisher School's Principal and Mrs. Harrison is Fisher School's Vice–Principal. Mrs. Harper, Ms. Parnell, Mr. Rodriguez, Principal Morris and Vice–Principal Harrison are all non-Caucasian.

Ms. Whitright complains that she was subject to various incidents of insubordinate, rude, and harassing behavior, and was the victim of "racial comments" from the CDAs and paraprofessionals, primarily Mrs. Harper, Ms. Parnell, and Mr. Rodriguez. Ms. Whitright asserts that Mrs. Harper and Ms. Parnell routinely refused to do what she asked of them, disparaged her in front of students, and falsely accused her of using a student's blanket as a mop and of pulling a student's ear. She also asserts that Ms. Parnell would sit in Ms. Whitright's chair and refuse to move. She also accuses Mrs. Harper and Ms. Parnell of destroying Ms. Whitright's classroom materials. At least one parent complained to the school about the harassment of Ms. Whitright. *See* Pl.'s Mem. in Opp'n [doc. # 25] Ex. H ("Letter to Morris from Norma Richards re Whitright").

The comments Ms. Whitright ascribes as being racial are the following: (1) On September 28, 2004, in responding to a note Ms. Whitright left him asking him to move the "milk cartoons," Mr. Rodriguez wrote a note to plaintiff commenting: "[W]here to and what is a milk cartoon? I am getting confused ... I should be relocating back to Puerto Rico, perhaps" (ellipsis in original); (2) On October 14, 2004, Mrs. Harper responded to an instruction from Ms. Whitright with the comment: "I am not a maid"; (3) On April 6, 2005, Ms. Parnell said to parents of some of the students, within Ms. Whitright's hearing, that she could not retire because "George Bush took all her money and gave it to rich white people"; (4) On May 3, 2005,

Ms. Whitright said to Mrs. Harper who chaffed at an instruction, "I say black, you say white." In response, Mrs. Harper commented to Ms. Whitright "that was racial!"; (5) On May 3, 2005, Mrs. Harper said "I'm a beautiful, black woman" as she walked by Ms. Whitright during recess. *See* Def.'s Local Rule 56(a)(1) Statement [doc. # 22] ¶ 10; Pl.'s Local Rule 56(a)(2) Statement [doc. # 25–3] (admitting ¶ 10). Though she does not point to these statements in her Local Rule 56(a)(2) Statement [doc. # 25–3], from comments by her counsel at oral argument, Ms. Whitright also appears to allege the following additional comments as being racial: (6) On September 14, 2004, Mr. Rodriguez responded to Ms. Whitright's request that he do a task in part with the following request: "Please write my name with a g not a q. I'm not Portuguese"; (7) On another occasion, Ms. Parnell, who knew that Ms. Whitright drove a Mercedes, made comments about people who drive Mercedes and get free cheese. *See* Pl.'s Mem. in Opp'n [doc. # 25] at 4, 6.

Ms. Whitright agrees that she was never the victim of explicit racial slurs. *See id.* at 6, 8. Most of the incidents Ms. Whitright is alleging are recorded in a diary, *see id.*, Ex. C ("Whitright Daily Diary"), which she began keeping after contacting her union representative, who contacted HPS's Human Resources ("HR") Department. The HR Department then sent the union representative the School's harassment policies with instructions on keeping the diary, and the representative then forwarded the policies to Ms. Whitright.

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (alteration in original)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the plaintiff, *see Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials. . . ." Fed.R.Civ.P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and quotation marks omitted). However, "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000), where a plaintiff's argument is "based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct." *Tojzan v. N.Y. Presbyterian Hosp.*, No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *4 (S.D.N.Y. March 31, 2003).

### III.

■ There are material issues in dispute that preclude the Court from granting summary judgment to HPS on Ms. Whitright's hostile work environment claims. But there are no material issues of fact on her race discrimination and retaliation claims, and under governing Second Circuit precedent, HPS is entitled to judgment as a matter of law on those claims.[1]

### A. Hostile Work Environment, Counts Two and Six

■ To prevail on a hostile work environment claim based on the actions of co-

---

1. Ms. Whitright's federal and state law claims are subject to the same analysis. *See, e.g., Brittell v. Dep't of Corr.*, 247 Conn. 148, 164, 717 A.2d 1254 (1998) ("In defining the contours of an employer's duties under our state antidiscrimination statutes, we have looked for guidance to federal case law interpreting Title VII of the Civil Rights Act of 1964, the federal statutory counterpart to § 46a–60.").

workers, a plaintiff must establish two elements:

"(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."

*Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.2003) (alteration omitted). "The first element of a hostile work environment claim has both an objective and subjective component: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221 (2d Cir.2004) (quotation marks omitted). At oral argument, HPS conceded that Ms. Whitright meets the subjective prong of the analysis. As for the objective prong, the Second Circuit has instructed district courts as follows:

The matter of whether the conduct alleged was so "severe or pervasive" as to create "an objectively hostile or abusive work environment," is to be decided based on the totality of the circumstances, in light of such factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir.2004) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 & 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (stating that a hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment...."). A plaintiff can establish a hostile work environment by showing "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir.2000) (citation and quotation marks omitted). The Second Circuit has also repeatedly cautioned district courts about setting the bar too high. As that court recently commented:

While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*

*Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003) (quotation marks and alteration omitted and emphasis in the original). Finally, courts "recognize that most discrimination ... is not carried out so openly as to provide direct proof of it. Accordingly, an aggrieved party may use circumstantial evidence to assert a *prima facie* case of discrimination...." *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir.2004).

■ Drawing all possible ambiguities and inferences in favor of Ms. Whitright, as the Court must on a motion for summary judgment, the Court concludes that she meets the objective test, though just barely. At oral argument, HPS agreed

that for purposes of summary judgment, Ms. Whitright has made enough allegations to create a material issue as to whether her working environment was hostile. The real question then, is whether that hostility was based on Ms. Whitright's race. The support for this requirement is extremely thin, but the Court ultimately decides that Ms. Whitright has raised a genuine issue of material fact on that point.

The Court must first begin by noting that although Ms. Whitright appears to rely in part on the fact that the perpetrators of the alleged harassment and Principal Morris and Vice Principal Harrison were non-Caucasian to make this showing, that fact alone does not create a genuine issue as to whether the treatment Ms. Whitright allegedly received was racial. *See, e.g., Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998) (finding that fact that person who fired plaintiff was younger was insufficient to show age discrimination). What gets her past the bar are the incidents of "insubordinate, rude, and harassing behavior" that she asserts and some of the comments she presents such as the comment that Ms. Parnell allegedly made asserting that "George Bush took all her money and gave it to the rich white people." [2]

Close cases such this are best left for the jury to decide. *See Anderson v. England,* 359 F.Supp.2d 213, 218 (D.Conn. 2005); *Cf. Richardson v. N.Y. Dep't of Corr. Serv.,* 180 F.3d 426, 437 (2d Cir.1999) ("[T]he existence of racial harassment in a hostile work environment .... may thus be characterized as a mixed question of law and fact because it involves the application of a legal standard to a particular set of facts. Such mixed questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue.") (quotation marks and citations omitted). Thus, the Court concludes that Ms. Whitright raises a genuine issue as to whether her work environment was objectively hostile.

■ However, to proceed with her claim, Ms. Whitright also must impute her co-workers' behavior to HPS. To do that, she must show that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 72 (2d Cir.2000). It would appear that HPS had a complaint system in place and as such Ms. Whitright cannot show that HPS provided no "reasonable avenue for complaint." *See* Pl.'s Mem. in Opp'n [doc. # 25] Ex. D ("Memorandum from HPS Human Resources Regarding Central Harassment Team"). Nonetheless, Ms. Whitright provides enough evidence from which a reasonable jury might conclude that HPS knew of the harassment being meted out by Mrs. Harper and Ms. Parnell but did nothing about it. First, as to knowledge, it seems clear that HPS officials knew that Ms. Whitright felt that she was being harassed and bullied since Principal Morris makes reference to Ms. Whitright's complaints in a memo to her. *See* Pl.'s Mem. in Opp'n [doc. # 25], Ex. F ("Memorandum from Morris to Whitright re: Allegation of Bullying and Harassment") ("[W]e have met many times re-

---

**2.** The Court concludes that Mr. Rodriguez's comments should not be considered in this calculus. He did not work with Ms. Whitright directly and they only conversed through notes, not directly. Further, no reasonable juror could conclude that his comments displayed racial animus. In one note, Mr. Rodriguez merely asked Ms. Whitright to spell his name correctly, a request that is surely well within his rights, and in another, he mocked her for misspelling the word "carton."

garding [your allegations of bullying and harassment]....").[3] More importantly, Ms. Whitright also alleges that she complained to Principal Morris and Vice–Principal Harrison—during a December 2004/January 2005 meeting—that the harassment was race-based. Taking these claims as true for purposes of the current motion, the Court concludes that Ms. Whitright has raised a genuine issue as to whether HPS knew that she felt she was subject to race-based harassment.

Once this knowledge is attributed to HPS, the question is whether HPS did anything about the alleged harassment. HPS asserts that Principal Morris repeatedly verbally requested that Ms. Whitright provide more specific details about her allegations, and receiving no response and receiving more complaints from Ms. Whitright that her materials were being destroyed, on April 15, 2005, Principal Morris sent a memo to Ms. Whitright asking her to "present to me in writing by Monday, April 25, 2005 your specific details of your allegations." *Id.* HPS also states that Principal Morris gave Ms. Whitright a copy of the school's harassment complaint form, which Ms. Whitright neither confirms nor denies receiving. However, HPS also admits that Principal Morris never launched a formal investigation, though they note that this is because Ms. Whitright did not cooperate. Further, at oral argument, counsel for HPS noted that the actions taken would probably not merit the term "reasonable steps." Though it appears that HPS did take some action, the Court cannot say that a the school's actions were sufficient to avoid imputation, as a matter of law. Ms. Whitright has a difficult task in view of the evidence, but the Court cannot say that

she raises no genuine issue of material fact and that HPS is entitled to judgment on her hostile work environment claim as a matter of law.

**B. Race Discrimination, Counts One and Four**

■ To survive summary judgment on her race discrimination claims, Ms. Whitright must first establish a *prima facie* case by demonstrating that: (1) she is a member of a protected class; (2) she is qualified for her teaching position; (3) she suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. Once she makes this showing, the burden shifts to HPS to provide a legitimate, nondiscriminatory reason for its decisions; and if HPS does so, the burden then shifts back to Ms. Whitright to show that the proffered reason is pretextual. *See Dawson v. Bumble & Bumble,* 398 F.3d 211, 216 (2d Cir.2005).

■ It is apparent that while Ms. Whitright satisfies the first and second prongs of the *prima facie* case, she stumbles on the third, and is unable to rebut HPS's proffered legitimate, nondiscriminatory reasons. An "adverse employment action" requires showing "a materially adverse change in the terms and conditions of employment.... To be 'materially adverse', a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y. City Bd. of Ed.,* 202 F.3d 636, 640 (2d Cir.2000) (quotation marks omitted). Ms. Whitright points to three alleged adverse actions: (1) a poor performance evaluation given to her on June 13, 2005; (2) the docking of one day's pay; and (3) "constructive discharge," that is,

---

**3.** The Court does not look to Ms. Whitright's claims that she called HPS's HR Department, as Ms. Whitright admits that she never left

messages and as such the Court cannot conclude that HPS was put on notice by her calls to HR.

that by not protecting her, and by subjecting her to the two other adverse actions she asserts, Principal Morris and Vice-Principal Harrison forced Ms. Whitright to retire. The Court will address these in reverse order.

 Ms. Whitright cannot show that she was constructively discharged. A "claim for constructive discharge requires the plaintiff to prove that her employer *deliberately and discriminatorily* created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir.2006) (emphasis added). "[I]f a plaintiff suing for constructive discharge cannot show specific intent, he or she must at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective." *Petrosino*, 385 F.3d at 229–230 (quotation marks omitted). "Something beyond mere negligence is required." *Whidbee*, 223 F.3d at 74.

Ms. Whitright cannot show constructive discharge, and, indeed during oral argument her counsel recognized as much when he acknowledged that it was likely her weakest claim. As an initial matter, the Court expresses some skepticism that Ms. Whitright could show that her working conditions were "so intolerable that a reasonable person in the employee's position would have felt *compelled* to resign," given the fact that she resigned during the summer, after the school year was over and when she would have had little or no contact with the alleged perpetrators and Principal Morris and Vice-Principal Harrison, and while represented by counsel. Putting that skepticism aside, however, her claim fails because she cannot show that Principal Morris and Vice-Principal Harrison were anything other than ineffectual in stopping the alleged harassment. Ms. Whitright's claim that HPS acted "deliberately," boils down to her assertion that its officials did not respond effectively to her complaints of harassment. While this showing of negligence was enough to get Ms. Whitright past summary judgment on her hostile work environment claim, it does not suffice to show "deliberate" action.[4]

In support of her allegations of "deliberate" action, Ms. Whitright asserts that she verbally complained to Principal Morris and Vice-Principal Harrison on various occasions, including the one instance in which she says she indicated that the harassment was because of her race. But, she says, aside from one occasion on which she overheard Vice-Principal Harrison telling Mrs. Harper and Ms. Parnell that the harassment should stop and a memo from Principal Morris in response to her complaints that her materials were being destroyed, *see* Mem. from Morris to Whitright re: Allegation of Bullying and Harassment, which noted the lack of proof and asked her to submit her complaints in writing—which she never did—nothing was done. She also admits that Principal Morris may have provided her with a harassment complaint form, which she never submitted. Ms. Whitright also appears to suggest that HPS acted "deliberately" because she called HPS's HR Department several times to complain about

---

**4.** As previously discussed, imputing a claim of a hostile work environment caused by co-workers to the employer can be done by showing that the employer "knew of the harassment but did nothing about it." *Whidbee*, 223 F.3d at 72. By contrast, a claim for constructive discharge requires showing, at a minimum, that the employer "deliberately" created intolerable working conditions. *See Ferraro*, 440 F.3d at 101. Thus, while Ms. Whitright can meet the lower negligence standard for imputing a hostile work environment claim, she cannot meet the higher deliberate action standard needed to make out a claim of constructive discharge.

the harassment but never received a call back. However, she admits that she never left a message indicating the reason for her call when she called. Further, she admits receiving a harassment complaint form from HR (at the same time she received the instructions on keeping a diary), and that she never filed this form. It is apparent that these undisputed facts, even taken with the docking of pay and poor performance evaluation discussed below, do not, under the standards adopted by the Second Circuit, provide enough evidence to permit a reasonable jury to find that Principal Morris and Vice–Principal Harrison *deliberately* and discriminatorily created intolerable working conditions so as to make a reasonable person resign. *See, e.g., Whidbee,* 223 F.3d at 74 ("As ineffective or even incompetent as [the company's] handling of the matter may have been, it does not rise to the level of deliberate action required by our precedent."); *see also Lupacchino v. ADP, Inc.,* No. 3:02CV2281 (MRK), 2005 WL 293508, at *5 (D.Conn. Jan. 21, 2005).

■■■ Nonetheless, Ms. Whitright also proposes that the docking of a day's pay and poor performance evaluation each independently suffice to show an "adverse action." This may be. *See Treglia v. Town of Manlius,* 313 F.3d 713, 720 (2d Cir.2002). However, even if Ms. Whitright were to pass this hurdle, she fails to overcome HPS's proffered non-discriminatory reason for docking her pay and giving her a poor performance evaluation. Ms. Whitright says she was docked a day's pay when on May 11, 2005, after feeling particularly harassed by Mrs. Harper and Ms. Parnell, she left school without permission or notice, but asked Mrs. Harper, one of her alleged harassers, to alert Principal Morris and Vice–Principal Harrison of her departure. It appears that Mrs. Harper did not in fact do so and Principal Morris and Vice–Principal Harrison subsequently sent Ms. Whitright a memo regarding her

absence and also called her into a meeting to discuss it. It was after this set of incidents that Ms. Whitright's pay was docked for leaving school without permission. It was also soon after that incident that she received the "Needs Improvement" performance evaluation. And, the record reflects that Ms. Whitright had received other such evaluations, including one from a previous school. *See* Statement of Material Facts [doc. # 22], Ex. A ("Whitright Transcript"), at 101–102. Further, Ms. Whitright has not provided any evidence that Principal Morris and Vice Principal Harrison have not docked the pay of non-Caucasian workers for leaving school without permission or that they treated those employees better than Ms. Whitright. In sum, even taking the evidence in the light most favorable to Ms. Whitright, she has failed to come forward with evidence that would permit a reasonable jury to conclude that the school's proffered reasons for its actions were pretextual and the real reason was discrimination.

Accordingly, HPS is entitled to summary judgment on Ms. Whitright's claims of race discrimination.

## C. Retaliation, Counts Three and Five

■■■ The standard for retaliation claims is as follows. In order to establish a *prima facie* case of retaliation, Ms. Whitright must show that: "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of [her] participation in the protected activity; (3) the employer took adverse action against [her]; and (4) a causal connection existed between [her] protected activity and the adverse action taken by the employer." *Mack,* 326 F.3d at 129 (citations and quotations omitted). If Ms. Whitright carries her *prima facie* burden, "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *See Pat-*

*terson,* 375 F.3d at 221 (quotations and citations omitted). Once the employer does so, the burden shifts back again to the employee to offer evidence showing that "the legitimate reasons offered by [HPS] were not its true reasons, but were a pretext for discrimination." *Id.*

For the purposes of this ruling, the Court assumes that Ms. Whitright is able to meet the first three prongs of her retaliation claim. However, this claim is appropriate for summary judgment because Ms. Whitright fails to meet her burden on the fourth prong as she cannot show a "causal connection" between her protected activity and any adverse action taken by the employer. At oral argument, counsel for Ms. Whitright admitted that for purposes of her retaliation claim, the protected activity Ms. Whitright engaged in was her alleged December 2004/January 2005 complaint that the harassment she was receiving was based on her race. Counsel also conceded that the only "adverse action" Ms. Whitright could point to is Principal Morris and Vice Principal Harrison's alleged failure to take steps to stop the harassment. As already noted, this failure may enable Ms. Whitright to survive summary judgment on her hostile work environment claims, but if falls short in the context of her retaliation claim because no reasonable jury could conclude on the evidence presented that they failed to act *because* she complained of race discrimination. Ms. Whitright herself states that HPS's failure to protect her began long before her December 2004/January 2005 complaint. She does not allege that this failure intensified after that complaint, nor does she provide any evidence that the continued refusal to protect her was based on her December 2004/January 2005 complaint. In some cases, a causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action. *See Patane v. Clark,* 508 F.3d 106, 116 (2d Cir.2007).

However, such proximity, which must be "very close," *id.,* is absent in the context of this case. Given the total absence of proof on this point, no reasonable jury could find that a causal connection exists between her protected activity and her allegations of adverse action. Thus, Ms. Whitright's retaliation claim fails as a matter of law.

### III. Conclusion

For the reasons discussed in detail above, the Court GRANTS IN PART and DENIES IN PART, HPS's Motion for Summary Judgment [doc. # 20]. Summary Judgment is GRANTED on Counts One, Three, Four, Five, and Seven, and DENIED on Counts Two and Six. The Court will issue a trial schedule in a separate order.

IT IS SO ORDERED.