**Catherine MARVELLI, Denise Mattox, M.D., Lillian Morales, Seon Mickle, and Tanisha Gardner, Plaintiffs,**

v.

**CHAPS COMMUNITY HEALTH CENTER, Staten Island University Hospital, Municipal Training Center, Duncan J. Huie, and Mark Appel, Defendants.**

No. 99 CV 8262(NG).

United States District Court, E.D. New York.

March 27, 2002.

Michael G. O'Neill, New York, NY, for plaintiff.

Michael J. Volpe, Sheldon Eisenberger, New York, NY, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

Plaintiffs Catherine Marvelli, Denise Mattox, Lillian Morales, Seon Mickle, and Tanisha Gardner bring this action against defendants CHAPS Community Health Center, Staten Island University Hospital ("SIUH"), Municipal Training Center ("MTC"),[1] Duncan Huie, and Mark Appel alleging 1) unlawful sexual and racial harassment in violation of 42 U.S.C. § 1981, the New York Executive Law §§ 296 *et seq.* ("NYSHRL"), and Article 8 of the New York City Administrative Code ("NYCHRL"); 2) retaliatory termination in violation of 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL; and 3) assault and battery. A further claim for intentional infliction of emotional distress has been withdrawn.

Defendants SIUH, CHAPS, and Huie, and separately, Appel, move for summary judgment pursuant to Fed.R.Civ.P. 56(b) to dismiss plaintiffs' claims in their entirety. Plaintiffs oppose the motions for summary judgment and seek to amend the complaint to add a Title VII claim.

### Facts

Unless otherwise indicated, the following facts are undisputed.

---

1. At oral argument, plaintiffs' counsel stated that MTC is bankrupt and plaintiffs are no longer pursuing claims against it.

### 1. Mattox and Marvelli's Employment History:

Mark Appel founded CHAPS in January 1998 as an out-patient healthcare facility, and managed the company for a year. Originally, there were four employees. There were two doctors, Dr. Denise Mattox and Dr. Cheryl Brown–Murray, as well as an Administrator, Karen Bronstein, and a Receptionist, Donna Samuels. In June 1998, Bronstein resigned and Appel hired Duncan Huie as CHAPS' Administrator. Huie began working in July 1998, and Catherine Marvelli began work as an intern shortly thereafter. On August 3, 1998, Huie hired Marvelli as a billing assistant. Huie knew Marvelli from Brookdale Hospital, where she had worked as an intern for Huie. According to Marvelli, Huie told her that CHAPS is an "Article 28" facility under the New York Public Health Law, which means that it bills patients at a flat rate of $146.47, regardless of the services rendered. Other clinics could charge only between $40 and $60 for the same services. According to Marvelli, Huie explained to her that CHAPS agreed with other clinics to bill Medicare under CHAPS' name for the higher amount, and the two clinics split the additional revenue. Marvelli Dec. ¶ 4.

In late 1998, Appel negotiated with SIUH for SIUH to acquire corporate sponsorship over CHAPS for $2.5 million. Pursuant to the transfer of sponsorship between CHAPS and SIUH dated December 28, 1998, SIUH became the sole member/sponsor of CHAPS, effective January 1, 1999. It is undisputed that at all times CHAPS and SIUH were two "separate entities." They had separate operations, payrolls, employee handbooks, employment practices and procedures, offices, locations, and bank accounts. After the transfer of sponsorship, Appel was no longer affiliated with either CHAPS or SIUH in any manner.

In February 1999, SIUH appointed James Walsh to be CHAPS' Executive Director. Walsh claims that he made frequent visits to CHAPS, but Marvelli claims that he only rarely visited the CHAPS facility. Walsh Dec. ¶ 5; Marvelli Dec. ¶ 50. Walsh read and analyzed CHAPS' financial records, payroll records, and other business related records in February 1999, which showed CHAPS had a negative cash flow from operating activities in excess of $400,000.[2] Defendants submit an independent auditors' report with their Reply Memorandum from independent auditor KPMG dated December 31, 1998 indicating that CHAPS had a negative cash flow of over $400,000. Walsh believed that this was due, in part, to a lack of patients using the facility. Walsh Dec. ¶ 8.[3] On a visit, Walsh noticed that Brown–Murray and Mattox were not treating many patients and that Marvelli was frequently absent. According to the payroll, Marvelli worked only an average of 26 hours a week

---

2. Plaintiffs claim that Walsh had very little knowledge about CHAP's employees and staffing, but it is clear from his deposition testimony that Walsh's limited knowledge is about the employees working at CHAPS now, under the University Physicians Group, not the staff at CHAPS in February 1999. Walsh Depo. 16–23.

3. Plaintiffs' Rule 56.1 Statement claims, relying on Marvelli's Dec. ¶ 56, that Walsh said he didn't really know CHAP's financial condition and that he never told anyone that CHAPS was in a bad financial condition. However, Marvelli did not state that Walsh never told anyone that CHAPS was in a bad financial condition. While she does claim Walsh told her Huie would have to remain because Walsh didn't really know CHAP's financial condition, Marvelli states that when Walsh terminated her, he said that CHAPS was losing money. Mattox also testified that Walsh told the CHAPS employees that they were being terminated because CHAPS was losing money. Mattox Depo. 194–95.

for the first quarter of 1999, when she was supposed to be working at least 35 hours a week. Walsh Depo. 31–34; Walsh Aff. ¶¶ 8–9. Marvelli claims that she:

did take some sick days, but I had no other attendance problem and Walsh never mentioned this to me.... While Walsh was rarely at CHAPS, it is possible that I would not have been there on occasion. This is because, as a result of my complaints to Appel about Huie, Appel told me that I could do billing on the weekends and minimize the amount of time that I had to work with Huie. Therefore I adjusted my schedule and sometimes worked on the weekend and took days off during the week.

Marvelli Dec. ¶ 57.

Based on its deficits and lack of patients, Walsh made the decision to restructure CHAPS and terminate Brown–Murray, Mattox, and Marvelli. Walsh Depo. 31–34; Walsh Aff. ¶ 10. In March 1999, CHAPS contracted with the University Physicians Group ("UPG"), which is affiliated with SIUH, to run CHAPS. Under the agreement, UPG would operate the entire CHAPS operation. Walsh concluded that UPG would provide a better opportunity for UPG to create a positive cash flow because UPG physicians had their own patient base. SIUH had used UPG with success on previous occasions for other out-patient facilities. Walsh Depo. 18, 31; Walsh Aff. ¶ 11. Walsh testified as follows:

Q Why did you determine that they [Mattox and Marvelli] should be terminated?

A It was a business decision. The two or three weeks that I spent there, I noticed a lack of patients, and the time that the doctors were doing nothing because of the lack of patients.

I then looked at the revenue that were being generated there, and the actual costs of the doctors and Ms. Marvelli, and I decided that we should go in a different direction.

Q What was the direction that you decided to go in?

A At that time, we were looking at various options, and the one that we finally went with was an interim step through University Physicians Group.

\* \* \* \* \* \*

Q What was the reason for terminating Catherine Marvelli?

A We were deciding to go in a different direction, and I felt that it was better to everybody during this reconstruction—let's go start with a fresh team.

Q What was the new direction with respect to effecting Ms. Marvelli's employment?

A I just felt that besides her sporadic attendance when I was there, that she was entrenched with the same model, the same concept that was already there. The culture was there and the model. I felt a new team was the right decision.

Q What was the culture and concept that you were referring to?

A They seemed to be very satisfied with no patients. They didn't seem to be upset that the business was not there, that it was okay.

Walsh Depo. 31–33. It is undisputed that neither Huie nor Appel were involved in any manner with Walsh's decision to contract with UPG and terminate Mattox and Marvelli. Walsh Aff. ¶ 14, 31, 52–53.

Walsh terminated Brown–Murray, Mattox, Marvelli at a meeting on March 16, 1999. Mattox testified that the following exchange occurred at the meeting:

Q What did Mr. Walsh say to you?

A We were fired.

Q Did he inform you that Chaps was running at a deficit or at a loss?

A Yes, he did.

Q What else did he tell you?

A He said they just couldn't keep doing that, that he had analyzed the situation since he had been Administrator and he looked into it and he just really couldn't—he couldn't be responsible for continuing an operation that was hemorrhaging financially to such an extent, so that he was going to close Chaps and restructure it so that it would be—so I guess it would be more cost-effective or something.

Q Did he inform you that he was going to attempt to restructure Chaps to have it run not at a deficit?

A He said the reason that he was closing it was because it was running at such a tremendous loss and it needed to be restructured.

Mattox Depo. 194–95. In an affidavit, Marvelli states that Walsh told her how CHAPS was going to expand and make a lot of money, and that he "never said anything" about CHAPS losing money. However, later in the affidavit, and at her deposition, Marvelli claims that, at the March 16, 1999 meeting, Walsh said "something about the place was hemorrhaging financially and because of the financial costs, he would have to let me go and restructure CHAPS or something like that." Marvelli Depo. 23; Marvelli Dec. ¶¶ 54, 56.

According to a Personnel Policy and Procedure that Appel instituted in 1997:

Employment with the C.H.A.P.S. Community Health Center is not for any stated period and can be terminated by either party at any time.

\* \* \* \* \* \*

1.1a Dismissal

Management and/or the Board at its sole discretion may terminate employment due to changes in staffing patterns, reduction in work force or for budgetary or other economic reasons. \*Employees will be given as much notice as possible.

\* \* \* \* \* \*

1.1b Reorganization and Restructure

\* If the results of reorganization or restructure of the C.H.A.P.S. Community Health Center causes the elimination of certain jobs, those employees affected will be given at least one month's notice. Exception to this would be if funds are suddenly fund [sic] thereby not allowing such notice.

O'Brian Ex. B.

### 2. Huie's Alleged Harassment of Mattox and Marvelli

Shortly after beginning work, Marvelli claims that Huie made "low level off color remarks" such as saying he did not notice any panty lines and asking whether Marvelli was wearing a thong. However, she claims that his comments began to become more severe beginning in September 1998. She claims that he constantly commented about women's shoes, and at one point took a picture of Mattox's feet. He also started to talk a lot about his personal life, particularly the fact that he dated a lot of strippers. Marvelli Dec. ¶¶ 11–12. Huie spoke "about how he dated a stripper with big breasts and that it stunk, her breasts stunk from underneath." Marvelli Depo. 69. He said that Marvelli would not have that problem because she has small breasts. When Marvelli asked Huie to stop, he said "you're a part of the iddy bitty titty community and that's why you don't want to talk about it." Marvelli Dec. ¶ 27. According to Marvelli, Huie would also ask Marvelli "[a]fter you take a shit, do you look in the toilet bowl before you

flush?" Marvelli Depo. 107. Marvelli testified that she found this sexually offensive. Marvelli Depo. 107.

In October 1998, Huie told a patient that Marvelli was a transvestite. Marvelli Depo. 62, 75–76. Following this incident, Huie would make daily jokes about Marvelli being a transvestite to her and the patients. Marvelli claims she asked Huie to stop, but he ignored her. Marvelli notified Appel about this incident. While she testified that she did not recall the exact date of the complaint to Appel, she testified as follows:

Q As you sit here today, are you sure that you reported this incident to Mr. Appel in October of 1998?

A Yes.

Q It's not possible that your report was after October of 1998?

A No. I remember I was pretty upset about it, so I remember I did contact Mr. Appel about it.

Marvelli Depo. 61, 171. She told Appel that " 'Duncan does not act right and it's becoming ridiculous.' " In response to a question whether she told Appel that she had been sexually harassed, Marvelli testified "I didn't say I was sexually harassed in those words. I just told him what Duncan [Huie] had done." Marvelli Depo. 168, 174; Marvelli Dec. ¶ 16. Appel claims that he received numerous complaints about Huie after he left CHAPS in mid-February 1999, but that he never received any complaints before he left. Appel Depo. 83–86.

In November 1998, Marvelli claims that Huie called Brown–Murray a "fucking bitch" to her face while Marvelli, Huie, and Brown–Murray were discussing supplies. Marvelli claims that she called Appel that day and informed him about the incident with Brown–Murray and that Huie was "harassing Karen, an intern, and myself." In response, Marvelli claims Appel said he was working on terminating Huie. Marvelli

Dec. ¶¶ 17–22. However, it is undisputed that the interns did not begin working until December and January. Morales, a student intern, also claims Huie discussed how many women he had slept with, told her that the breasts of women with large breasts smell, called Marvelli a transvestite, and called doctors "bitches." Morales Depo. 20–27.

Throughout this period, Marvelli claims that Huie made racist, sexist, and scatological jokes and comments on a daily basis. One recurring joke was that Huie would come "out of the bathroom with his hands wet and [say] that he just peed in his hands, and he would wipe the wetness on his arm and tell me, 'Now I just wiped my piss on you.' " Marvelli Depo. 69; Marvelli Dec. ¶¶ 23–24. Marvelli claims she informed Appel, Huie's supervisor, but that she does not remember when she told him about this incident. Another running joke was that Huie would "brush his teeth and let the foam of the toothpaste run down the side of his mouth, and go, 'What does this look like?' " Marvelli Depo. 107; Marvelli Dec. ¶ 25. Marvelli does not recall how often Huie made these comments. Marvelli Depo. 62–63.

Huie would also tell Marvelli that she should have sex with employees of the coffee shop next door to get a free lunch, or that she should have sex with Appel, saying "if you guys throw him a bone, baby he will do right by me and I'll do right by you." Marvelli Dec. ¶ 25. Morales and Tanisha Gardner, another student intern, claim that Huie made the same joke about getting a free lunch about one of the interns. Morales Depo. 20–27; Gardner Depo. 68–70. At another point, Huie asked why Marvelli had no children, and before she could answer, he stated, "oh I know, it's because you would have a to breast feed them and you don't want your t*ts to get stretched out and saggy."

Marvelli Dec. ¶ 29. Huie also sent a photograph he had downloaded from the internet of a woman with dogs painted on her bare breasts around the office, and asked Marvelli to look at an image of a penis on his computer screen. Marvelli Dec. ¶ 33; Plaintiffs' Exhibit G.

Marvelli, who is part African American, claims that Huie often made racist and sexist jokes about her having large buttocks. Huie would draw pictures of Marvelli's buttocks. Marvelli never showed this picture to Appel. Marvelli Depo. 62–63. He also said " 'you are big in the back like a black chick. You have a black butt.' " Marvelli Depo. 125. Huie made other racist comments. On one occasion, when rap music was playing in the office where Marvelli was working, and rock music was playing in the office where Huie was working, Huie said to Marvelli that she "would appreciate the rock music because I have white blood in me and don't need the nigger rap music." Marvelli Depo. 126. At another point, Huie told Marvelli that she looked like a "rasta" when she had braids in her hair. Marvelli Depo. 128.

Marvelli claims that Huie also made racist and sexist comments about other people. Huie "constantly" referred to Morales, who is Puerto Rican, as a "wetback." She claims Huie called Morales "stupid, illiterate, a worthless Mexican and dozens of similar comments. Again, this was on a daily basis." He also made comments about Gardner's dark skin and made sexually derogatory comments about her. Marvelli Dec. ¶ 31. The student interns also testified that Huie made these comments. Morales Depo. 20–27; Mickle Depo. 21–23; 34; Gardner Depo. 68–70.

Mattox claims that Huie showed her pictures of male private parts on his computer screen, and sent her a picture of a women with dogs painted on her bare breasts. He would also tell Mattox about the strippers he was dating. Mattox testified that she also thought Huie was being racist and sexist when he called her "shortie." Mattox also claims that Huie "often" told jokes about Jewish people. The specific joke that Mattox remembers is "what happens to a Jewish man with a hard-on when he runs into a wall? He breaks his nose." Mattox. Depo. 159–60. He also referred to Brown–Murray, who is African American, as an ape and drew a picture of her as a monkey. Finally, Mattox claims that he would "do parodies of black people, you know, like shuck-and-jive talk." For example, Huie would say "hey, Hommey, I'm down with it." Mattox Depo. 156. Mattox Depo. 154–160. Gardner claims that she heard Huie call Brown–Murray a gorilla, and Seon Mickle, a student intern, claims that Huie showed him the same picture of a women with dogs painted on her bare breasts. Gardner Depo. 68–70; Mickle Depo. 21–23; 34.

Huie denies all the allegations of Mattox and Marvelli. Huie Depo. 42, 115–16, 120. There is no evidence that Mattox ever complained to Appel about Huie. Other than reporting the transvestite comment to Appel in October 1998, Marvelli testified she did not recall exactly when she complained to Appel about any incident. Marvelli Depo. 65–67.

Marvelli claims that after SIUH acquired CHAPS on January 1, 1999, no one supervised Huie. Marvelli claims that no one from SIUH ever introduced themselves and they did not know who to talk to about Huie. After SIUH acquired CHAPS, Marvelli claims that Huie complained to her that he had bought his girlfriend an expensive Christmas present, and he had not received "pussy" in return. After complaining about his sex life, Huie told Marvelli that Huie was going to rape his girlfriend. Marvelli claims that she became frightened and vomited because

she had been raped. Marvelli claims that that evening she called Appel and told him she worried that Huie might be a rapist. Marvelli claims that Appel responded with a joke, saying that he had Huie "pegged more as a child molester than a rapist." When Marvelli said she was serious, she claims Appel apologized for leaving Huie at the clinic, but that he was working with SIUH to get him terminated. According to Marvelli, no action was ever taken. Marvelli Dec. ¶¶ 37–39.

In February 1999, Huie asked Marvelli's friend, who was calling Marvelli on the telephone, about her shoes and asked her out on a date. When Marvelli informed Huie that this was offensive, Huie asked Marvelli to ask her friend if she would "blow" him. Marvelli became angry, and Huie said "you can blow me too" and started to unzip his pants. Marvelli Dec. ¶¶ 40–43. Following this incident, Marvelli claims that they called Appel again, who gave them a telephone number to call at SIUH. Brown–Murray left a "detailed" message explaining why they were calling on Monday February 8, 1999. Marvelli left early that day and took the next two days off sick. She claims that Huie was making her physically sick. Since SIUH had not returned their phone call, Marvelli claims that on February 11, 1999, the entire staff of CHAPS confronted Huie about his behavior. Huie broke down in tears and acknowledged that he behaved inappropriately. He stated he was having a breakdown because of the stress he was under. Marvelli Dec. ¶¶ 36–45.

The following day, which was a Friday, Huie showed up to work drunk and began arguing with Brown–Murray. Brown–Murray and Marvelli faxed SIUH requesting an immediate meeting. That following Monday, Mattox went to SIUH to try and speak with Joe Pasani, an officer of SIUH who had helped to acquire CHAPS, but Pasani refused to see her. The next day,

February 16, 1999, the five plaintiffs and Brown–Murray went to SIUH corporate offices without a meeting to complain about Huie's behavior. Marvelli Dec. ¶¶ 36, 44–48. They met with Gerald Ferlisi, Vice President of Finance, and Caryl Mahoney, Senior Vice President of Human Resources. This was the first time any of the plaintiffs complained to SIUH.

The next day, February 17, 1999, Ferlisi and Mahoney met Huie to discuss the allegations. At that meeting, it was decided that 1) Huie would resign as administrator of CHAPS; 2) Huie would be retained for one year as a consultant to CHAPS, primarily to reconcile CHAPS' billing records; 3) as a consultant, he would work at SIUH corporate offices and would not have unescorted access to CHAPS. Huie had done all the Medicaid billing using his own computer software, and CHAPS was facing a Medicaid audit. Marvelli Dec. ¶¶ 4, 50. Plaintiffs were terminated about a month later, and defendants claim that no further harassment occurred in that month. Marvelli claims that Huie returned to CHAPS one more time unsupervised, but he did not make any offensive comments. She also claims he returned to CHAPS and touched her shoulder. Marvelli Dec. ¶ 53. In letters dated February 24 and February 25, 1999, Brown–Murray, Mattox, and Marvelli complained to Glover, Mahooney, and Ferlisi that Huie had been back at CHAPS unsupervised, and demanded that Huie be kept away from CHAPS. However, there is no indication that Marvelli informed SIUH that Huie had touched her.

### 3. *Appel's Alleged Harassment of Mattox*

Mattox claims that Appel made repeated, unwanted sexual advances towards her. While she admits that Appel never said he was interested in having sexual relations with her, Mattox claims his ac-

tions made it clear that he was interested in a sexual relationship. Mattox Depo. 142; Mattox Dec. ¶ 3. He would call her at home or come into her office and have extensive idle conversations with her. Mattox claims that most of the time that Appel came into her office to have these conversations, he would shut the door. Mattox Dec. ¶¶ 5, 13. One time, Appel "pretended to be having sex with me while speaking on the phone to another employee of the clinic. This led to immediate rumors that I was sleeping with Appel." Mattox Dec. ¶ 12. Mattox also claims that Appel would frequently invite Appel to come over to his house for dinner. Mattox responded that "that's not appropriate" and that she did not mind going to a restaurant if Appel wanted to speak with her, but she would not go to his home. Mattox Depo. at 139–40. Appel also invited Mattox to join him on vacation, offering to buy her a ticket. Mattox rejected the offer. *Id.* at 140–41.

Mattox, who is African American, also claims that Appel suggested that he was interested in a sexual relationship because he "made it very clear" that he had a "preference for Black women" by bringing his girlfriends, who Mattox claims were always young black women, to the clinic and commenting that they slept at his apartment. On one occasion, Mattox claims Appel asked her, "can you tell me why black women sleep so bad? This morning I woke up with a big black butt in my face." Mattox Depo. 138.

Mattox also claims that Appel engaged in inappropriate touching on several occasions. On one occasion in 1998, Appel pulled Mattox out of an examination and asked that she drive him to the subway station. Mattox claims she refused but that Appel "insisted." Mattox claims she asked Appel to get out of his car twice, but he continued "chattering on and on." Appel reached over and put his finger through a hole in Mattox's pantyhose and said "hey, what's this?" Mattox claims she responded by telling Appel "[d]on't do that. Leave." She claims that Appel took his finger out of her pantyhose and exited the car. Mattox Depo. 139–40; Mattox Dec. ¶¶ 6–11. On another occasion, Appel "fingered a button on my skirt and said, so is this one of those where if I undo this one button, the whole thing comes off?" Mattox Depo. 138. Appel would also "brush spots off my sweater near my breasts, cleaning me up. I didn't see anything there." Mattox Depo. 139–40. Mattox responded "I'm fine, Mark. Now step away." *Id.*

Mattox claims that this behavior was "relentless," and it negatively affected her work because she had to spend time trying to avoid Appel and she could not discuss work related matters, such as obtaining supplies, with Appel. Mattox Dec. ¶¶ 14–15, 18.

### 4. Interns' Employment History

In late December 1998 and January 1999, CHAPS permitted three interns from the MTC to complete their field placement at CHAPS. Lillian Morales started her internship in late December 1998. Seon Mickle started his internship in January 1999. Tanisha Gardner started her internship in January 1999. Appel did not know Gardner, Mickle, and Morales because he was no longer associated with CHAPS. It is undisputed that at MTC, Gardner, Mickle, and Morales were specifically told that there would be absolutely no guarantee of employment at their field internship placements. It is also undisputed that Gardner, Mickle, and Morales did not receive any compensation or benefits from their internship. The three interns were never CHAPS' employees and were never on CHAPS' payroll. Their internships concluded by March 5, 1999. According to

Walsh, in 1999 there were no open positions at CHAPS, and they were not seeking job applications. Walsh Aff. ¶ 15. However, Morales testified as follows:

Q Isn't it true that Duncan Huie never guaranteed you employment with CHAPS?

A Duncan Huie did, yes.

Q What did he say?

A He would tell Dr. Mattox, "I'm not giving her a job."

Q He didn't guarantee you a job, correct?

A Correct.

\* \* \* \* \* \*

Q You never saw anything in writing that indicated that you were guaranteed a job at CHAPS at the end of the internship; isn't that true?

A He didn't guarantee me a job, but Dr. Brown–Murray did.

Q What did she say?

A She called Al Glover and Jerry Ferlisi, and she said that she needed the medical assistant.

Q That was a job guaranteed for you, Lillian Morales?

A Yes.

Q It's your testimony that because Dr. Brown–Murray called Al Grover or Glover and Jerry Ferlisi and indicated that she needed a medical assistant, you, Lillian Morales, were guaranteed a job?

A That is true. That was the statement.

Q That's your opinion, right?

A No. That's what I was told.

Q Who told you that?

A Dr. Brown–Murray.

Q What did she say to you?

A She said, "If you need a medical assistant and you feel that they are capable of doing the job, then he says you can put them on."

Q Who said that?

A Dr. Brown–Murray. Not only for me; to put the interns on, Seon and Tanisha Gardner, all the interns.

Q It's your testimony that all the interns who were at CHAPS were entitled to jobs? That's your opinion?

A Well, that's what Dr. Brown told us, yes. We were promised employment yes.

Morales Depo. 40–41.

## Discussion

### Summary Judgment Standards

■ Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *Id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In a discrimination action such as this, it is important to note that [a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence .... Consequently, in a Title VII

action, where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.

*Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

### Plaintiffs' Second Amended Complaint

■ In their Memorandum of Law in Opposition to Motion for Summary Judgment, plaintiffs seek to file a Second Amended Complaint, which adds a Title VII cause of action, removes their intentional infliction of emotional distress claim, and limits their assault and battery claim to Huie's touching of Marvelli. In their First Amended Complaint, plaintiffs had indicated that they intended to add a Title VII claim, and they received a right to sue letter from the EEOC on July 10, 2000. Defendants oppose the motion, arguing that plaintiffs failed to comply with Fed. R.Civ.P. 7(b), which requires a motion to be made in writing and state with particularity the grounds for the motion; Local Civil Rule 6.1, which requires a notice of motion be served on all parties in the action; and Local Civil Rule 72, which requires that the notice of motion based upon a rule or statute specify the rule or statute upon which it is predicated. Finally, defendants argue that permitting plaintiffs to amend their complaint now, after discovery has been closed and a summary judgment motion has been filed, would cause undue delay. Generally, permission to amend should be freely granted, but the court has discretion to deny leave to amend "where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defen-

dant." *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990). The burden is on the party who wishes to amend to provide a satisfactory explanation for the delay. *Id.*

■ Both sides in this case have proceeded on the misapprehension that plaintiffs may bring both race and sex discrimination claims under § 1981. Therefore the parties have already had discovery on the sex discrimination claims, which are cognizable under Title VII only, and fully briefed the issue in their papers. *Cf. Dais v. Lane Bryant, Inc.,* 1999 U.S. Dist. LEXIS 4387 (S.D.N.Y.1999) (Ellis, M.J.), *adopted by* 2000 WL 145755 (S.D.N.Y. 2000) (Leisure, J.). Since the Title VII claims are without merit, defendants will not be prejudiced by treating the claims as brought under Title VII as well as § 1981.

### Mattox's and Marvelli's Hostile Work Environment Claims

■ Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, ... sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). However, Title VII does not permit a cause of action against individuals, *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds by Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Industries, Inc.,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), or against companies that employ fewer than fifteen people. 42 U.S.C. § 2000e(b). Since CHAPS employed fewer than 15 people in calendar years 1998 and 1999, *see* Walsh Reply Aff. ¶ 4, plaintiffs may not maintain a Title VII claim against CHAPS. 42 U.S.C. § 1981 provides that

(a) All persons within the jurisdiction of the Unites States · shall have the same right in every State ... to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, ....

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

Unlike Title VII, § 1981 permits hostile work environment claims against individuals and companies with fewer than fifteen employees, but only provides for a hostile work environment claim based on race, ancestry, or ethnic characteristics, not based on sex. *See Dombrowski v. New York,* 1997 WL 314770 (2d Cir.1997), *cert. denied* 522 U.S. 1127, 118 S.Ct. 1076, 140 L.Ed.2d 135 (1998); *Zemsky v. New York,* 821 F.2d 148 (2d Cir.1987), *cert. denied* 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 75 (2d Cir.2000). Therefore, the only federal hostile work environment claims that plaintiffs may proceed on are a racial hostile work environment claim against Huie, Appel, and CHAPS under § 1981; and both a racial and sexual hostile work environment claim against SIUH under § 1981 and Title VII.

■■■ The standards for a hostile work environment claim under § 1981 and Title VII generally are the same. *Whidbee,* 223 F.3d at 69. In order to prevail on a hostile environment claim, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.; Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (*quoting Harris v. Forklift Sys.,*

*Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A "hostile work environment claim will succeed only where the conduct at issue is so 'severe or pervasive' as to create an 'objectively hostile or abusive work environment' and where the victim 'subjectively perceives the environment to be abusive.'" *Richardson v. New York State Department of Correctional Service,* 180 F.3d 426, 436 (2d Cir.1999) (*quoting Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). "[I]nstead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Whidbee,* 223 F.3d at 69 (*quoting Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997)). However, the offensiveness of the individual actions is also a factor to be considered in determining whether such actions are pervasive. *Id.* at 69.

■■■ To "withstand summary judgment a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* at 69. The Supreme Court has established a non-exhaustive list of factors relevant to the determination whether conduct is so severe or pervasive to support a hostile work environment claim. These include 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether the conduct was physically threatening or humiliating, or mere offensive utterance; 4) whether the conduct unreasonably interfered with plaintiff's work; and 5) what psychological harm, if any, resulted. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *Richardson,* 180 F.3d at 437.

1. *Mattox and Marvelli's Federal Hostile Work Environment Claim Against Huie and Appel Individually:*

■■■ a. *Marvelli's Hostile Work Environment (Racial) Claim Against Huie:*

Viewing the evidence in a light most favorable to plaintiffs, Marvelli has failed to meet her burden of demonstrating that Huie created a racially hostile work environment. Marvelli describes only three instances involving racial comments directed at her, as opposed to a "steady barrage of opprobrious racial comments." *Schwapp,* 118 F.3d at 110. First, Marvelli claims that Huie often would make jokes about her having large buttocks, but only one time was this framed in racial terms by saying "you are big in the back like a black chick. You have a black butt." On another occasion, Huie told Marvelli that she would like rock music because she has white blood, and that she did not need the "nigger rap" music. Third, when Marvelli put braids in her hair, he said that she looked "rasta." *See Francis v. Chemical Banking Corp.,* 62 F.Supp.2d 948, 959 (E.D.N.Y.1999), *aff'd* 213 F.3d 626, 2000 WL 687715 (2d Cir.2000), *cert. denied* 532 U.S. 949, 121 S.Ct. 1419, 149 L.Ed.2d 359 (2001) (holding that even offensive comments, if isolated, did not create a hostile work environment).

Marvelli also claims that Huie would constantly refer to Morales, who is Puerto Rican, as a "wetback" or a "Mexican." Although she claims that Huie often referred to Morales in derogatory terms, she does not indicate how often the rude comments he made about Morales were racial. These comments, directed towards a different minority, although of limited probative value, cannot be ignored on summary judgment. *See Schwapp,* 118 F.3d at 111 (holding that a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment). Even considering the incidents Marvelli experienced more directly in light of these incidents, a reasonable jury could not conclude that this "series of incidents was sufficiently continuous and concerted to have altered the conditions of [Marvelli's] working environment." *Whidbee,* 223 F.3d at 69.

■ *b. Mattox's Hostile Work Environment (Racial) Claim Against Huie:* Mattox has failed to show that Huie created a racially hostile work environment. Mattox points to two allegedly racist comments that Huie directed at her. She claims that Huie engaged in racial harassment when he called her "shortie" and did a "parody" of African Americans by saying, "hey, Hommey, I'm down with it." To the extent that a reasonable jury could conclude that these comments are racist, they are of limited severity. The racial comments that Huie directed at other people were more severe. Huie referred to Brown–Murray as an ape and a monkey, and made jokes about Jews. Nevertheless, Huie's racial slurs, which occurred over the approximately 8 months he worked at CHAPS, were sporadic rather than a steady barrage of opprobrious racial comments. *See Richardson,* 180 F.3d at 440 (holding that evidence that a co-worker commented that all black inmates look alike, along with evidence of two other racially derogatory comments directed towards other races, was insufficient to establish a hostile work environment).

■ *c. Marvelli's Hostile Work Environment Claim (Racial) Against Appel:* Marvelli does not claim that Appel directly harassed her. Rather, she claims that Appel is liable for Huie's conduct as his supervisor. However, as discussed above, a reasonable jury could not conclude that Huie racially harassed Marvelli. Therefore, the claim against Appel must be dismissed as well. Even if Marvelli could state a claim against Huie, Appel could not be held liable because, while § 1981 provides for individual liability, "a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.'" *Whidbee,* 223 F.3d at 75. Marvelli never claims that she complained to Appel about Huie's racial

comments, and, even if she did, she would have to show more than negligence on Appel's part in maintaining CHAP's anti-discrimination policy; she would have to show personal involvement. *See id.* at 75.

■ *d. Mattox's Hostile Work Environment (Racial) Claim Against Appel:* For the same reasons discussed above, Appel is not liable under § 1981 as Huie's supervisor for any racial harassment by Huie against Mattox. Nor has Mattox shown that Appel created a racially hostile environment directly. Mattox hostile work environment claim against Appel consists of only one allegedly offensive comment. Mattox claims Appel asked her "can you tell me why black women sleep so bad? This morning I woke up with a big black butt in my face." This single offensive utterance over the approximately 14 months that Appel and Mattox worked together, while inappropriate, was not severe enough to altered the conditions of her working environment. *See Whidbee,* 223 F.3d at 69.

**2. *Mattox and Marvelli's Federal Hostile Work Environment Claim Against CHAPS and SIUH***

■ As an initial matter, defendants argue that SIUH should not be liable for the action of CHAPS employees because it is a separate entity. The law allows a corporation to organize so as to isolate liability among separate entities. *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir.1996); *Balut v. Loral Electronic Systems,* 988 F.Supp. 339, 344 (S.D.N.Y.1997), *aff'd* 166 F.3d 1199, 1998 WL 887194 (2d Cir.1998) (applying *Murray* to the discrimination context). Under the doctrine of limited liability, the law treats the employees of a corporate entity as the employees of a related entity only under extraordinary circumstances. *Id.* Four factors will determine whether two entities are a single employer: 1) interrelated operations;

2) common management; 3) centralized control of labor relations; and 4) common ownership. *Id.* Although no one factor is determinative, control of labor relations is the central concern. *Id.* In this case, it is undisputed that CHAPS and ·SIUH were "separate entities" with separate operations, payrolls, employee handbooks, employment practices and procedures, offices, locations, and bank accounts. However, plaintiffs argue that they should be treated as a single employer because Walsh, an SIUH employee, was CHAPS' Executive Director, he made the decision to terminate Mattox and Marvelli, and Huie agreed to resign after meeting with Mahoney and Ferlisi, two SIUH employees.

■ This court need not resolve this issue because, even if CHAPS and SIUH are a single entity, plaintiffs have failed to raise a material issue of fact genuinely in dispute that CHAPS created a racially hostile work environment under § 1981, or that SIUH created a racially or sexually hostile work environment under § 1981 and Title VII. Plaintiffs have not raised a genuine issue that Appel's and Huie's behavior, taken together, created a racially hostile work environment. However, even assuming that their behavior, taken together, created a racial and sexually hostile work environment, plaintiffs have not raised an issue of fact as to CHAPS' and SIUH's liability because there is not a "specific basis for imputing the conduct that created the hostile work environment to the employer." *Whidbee,* 223 F.3d at 72. It is undisputed that both Appel and Huie were supervisors. An employer:

> is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a

defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher,* 524 U.S. at 807–08, 118 S.Ct. 2275; *Burlington Industries, Inc.,* 524 U.S. at 765, 118 S.Ct. 2257. Once an employer has knowledge of a racially combative atmosphere, he has a duty to take reasonable steps to eliminate it. *Whidbee,* 223 F.3d at 72. An "employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct. However, we have held that if harassment continues after complaints are made, reasonable jurors may disagree about wheth-

er an employer's response was adequate." *Id.*[4]

In this case, defendants have met their burden of proof, and plaintiffs have failed to raise a material issue of fact genuinely in dispute that the employer failed to exercise reasonable care to prevent and correct promptly any harassing behavior, and that the plaintiffs reasonably took advantage of any preventative or corrective measures. Plaintiffs present no evidence that they complained to Appel about racial harassment or to SIUH about racial or sexual harassment until they complained to SIUH on February 16, 1999. Following these complaints, SIUH took reasonable steps. The day after the complaint, they terminated Huie from CHAPS, rehired him only as a consultant at SIUH's offices to do work plaintiffs acknowledge was essential, and prohibited him from returning to CHAPS unescorted. These steps were successful, as no further racial harassment occurred. Even though plaintiffs claim that Huie returned to CHAPS once unescorted and Marvelli claims that he touched her back, a claim which she did not make when complaining to SIUH, a reasonable jury could not conclude based on these facts that the measures were ineffective in preventing further sexual harassment.

Mattox and Marvelli argue that SIUH is vicariously liable for Appel's and Huie's behavior because they took reasonable steps to file a complaint with SIUH during the month and a half between the time that SIUH acquired CHAPS and February 16, 1999. Plaintiffs rely on Marvelli's claims that SIUH never introduced themselves to plaintiffs; that Marvelli did not know who to talk to at SIUH about Huie; and that she complained to Appel, who no longer worked for CHAPS, and he promised to talk to someone at SIUH about the

---

**4.** The standards governing employer liability for a hostile work environment claim brought under § 1981 and Title VII are the same. *See Whidbee,* 223 F.3d at 72.

problem. However, this does not show that Mattox and Marvelli took reasonable steps to file a complaint with SIUH prior to February. Plaintiffs do not indicate that they attempted to speak to anyone at SIUH about filing a complaint prior to February. Furthermore, it is undisputed that Walsh, the acting Executive Director, visited CHAPS, at least on some occasions, but plaintiffs did not inquire about how to lodge a complaint. The first indication that plaintiffs contacted someone at SIUH is Marvelli's claim that she called SIUH on Monday February 8, 1999. Plaintiffs met with SIUH representatives 7 business days later, on the following Tuesday, and on February 17, 1999, 8 business days after Marvelli claims she made her first phone call to SIUH, defendants instituted protective measures. A reasonable jury could not conclude that this response time of approximately a week and a half was anything but prompt. *See Walsh v. National Westminster Bancorp.*, 921 F.Supp. 168 (S.D.N.Y.1995) (granting summary judgment in favor of an employer on a sexual harassment claim where the employer investigated a sexual harassment claim and terminated the offending employee within 6 days).

**Mattox's and Marvelli's Retaliation Claims**

 Retaliation claims under Title VII and § 1981 are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Richardson*, 180 F.3d at 426; *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir.2001) (holding that retaliation claims are cognizable under § 1981). In order to establish a prima facie case of retaliation, a plaintiff must show (1) participation in an activity, protected under anti-discrimination statutes, that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the pro-

tected activity and the adverse decision. *Richardson*, 180 F.3d at 426. A causal connection "may be established either *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) (citation and quotation omitted) (emphasis in original).

Once a prima facie case has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *Id.; Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell–Douglas Corp.*, 411 U.S. at 802–03, 93 S.Ct. 1817. If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. *McDonnell–Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. 1817. However, "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that the fact-finder may infer discrimination from the falsity of the employer's explanation). In the summary judgment context, *St. Mary's* requires a plaintiff to "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the ad-

verse employment decision." *Gallo v. Prudential Residential Services Ltd., Partnership,* 22 F.3d 1219, 1225 (2d Cir. 1994).

 In this case, it is undisputed that Mattox and Marvelli engaged in protected activity by complaining about Huie's alleged harassment, and that they were subject to the adverse employment action of termination. However, assuming that Mattox and Marvelli could meet the minimal requirements of establishing a causal connection based on the fact that only one month passed between the protected activity and the adverse employment action, *St. Mary's Honor Ctr.,* 509 U.S. at 506, 113 S.Ct. 2742, they have not raised a genuine issue of material fact that defendants' articulated reason for their termination was pretextual and retaliation was the true reason.

Defendants articulate a legitimate, non-discriminatory reason for terminating Mattox and Marvelli. CHAPS, which SIUH had just acquired, was losing $400,000 annually because of a lack of patients, and Walsh decided to outsource CHAPS' operations to UPG. The physicians at UPG had their own patient base, and Walsh thought that this would improve CHAPS cash-flow. As a result, defendants claim they terminated all CHAPS' employees. It is undisputed that neither Huie nor Appel were involved in any manner with Walsh's decision to contract with UPG and terminate Mattox and Marvelli.

Plaintiffs argue that defendants have failed to offer a legitimate, non-discriminatory reason because they do not submit business records in support of their claims. In reply, Walsh submits an independent audit dated December 28, 1999 from KPMG showing a negative cash flow of $400,000. Defendants claim that this report was provided to plaintiffs during discovery. Plaintiffs also argue that the reasons offered by Walsh in his deposition were too vague and conclusory to satisfy defendants' burden of articulating a legitimate, non-discriminatory reason for Mattox and Marvelli's terminations. In support of this argument, plaintiffs cite to Walsh's testimony that the reason for terminating Marvelli was that "[w]e were deciding to go in a different direction, and I felt that it was better to everybody, during this reconstruction—let's go start with a fresh team" and "I just felt that besides her sporadic attendance when I was there, that she was entrenched with the same model, the same concept that was already there. The culture was there and the model. I felt a new team was the right decision." However, Walsh's full response to questions about why defendants were terminated is "clear and specific." *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1115 (2d Cir.1988). Walsh testified as follows:

Q Why did you determine that they [Mattox and Marvelli] should be terminated?

A It was a business decision. The two or three weeks that I spent there, I noticed a lack of patients, and the time that the doctors were doing noting because of the lack of patients.

I then looked at the revenue that were being generated there, and the actual costs of the doctors and Ms. Marvelli, and I decided that we should go in a different direction.

Q What was the direction that you decided to go in?

A At that time, we were looking at various options, and the one that we finally went with was an interim step through University Physicians Group.

\* \* \* \* \* \*

Q What was the reason for terminating Catherine Marvelli?

A We were deciding to go in a different direction, and I felt that it was better to everybody during this reconstruction—let' go start with a fresh team.

Q What was the new direction with respect to effecting Ms. Marvelli's employment?

A I just felt that besides her sporadic attendance when I was there, that she was entrenched with the same model, the same concept that was already there. The culture was there and the model. I felt a new team was the right decision.

Q What was the culture and concept that you were referring to?

A They seemed to be very satisfied with no patients. They didn't seem to be upset that the business was not there, that it was okay.

Walsh Depo. 31–33. This is sufficient to satisfy defendants' burden of producing evidence of a legitimate, non-discriminatory reason for plaintiffs' termination.

Nor have plaintiffs raised an issue of material fact that this asserted reason was pretextual and that retaliation was the true reason. Plaintiffs point to five circumstances they claim demonstrate that defendants' articulated reason was pretextual and that retaliation was the true reason. First, plaintiffs argue that the asserted negative cash flow was a pretextual reason because it did not matter whether CHAPS was making money from billing for its patients. According to plaintiffs, CHAP's primary function was as a repository for the Article 28 license, and that it made money by splitting the difference between the fees that Article 28 facilities and other clinics could charge with other clinics. Plaintiffs offer no proof in support of their allegation that CHAPS' primary purpose was to split fees with other clinics, but, even if plaintiffs could establish that CHAPS derives most of its income from fee splitting, this would not undermine the legitimate goal of increasing profits generated by billing for clients seen at CHAPS. Plaintiffs apparently concede as much, stating "[t]his is not to say that the SIUH defendants could not have had a legitimate interest in maximizing the efficiency of [CHAPS], but the question is not whether they could have, but whether they in fact did and if so, whether that interest was the sole motivating factor for the termination of plaintiffs' employment." Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment 11–12. Yet defendants have presented evidence, namely Walsh's testimony and the KPMG independent audit, establishing that maximizing CHAPS' efficiency was the motivating factor for the terminations, and plaintiffs' have not submitted anything to contradict this evidence.

■■ Second, plaintiffs argue that any cost-savings achieved by having UPG run CHAPS could have been achieved by placing them on UPG's payroll. However, "it is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *Dister*, 859 F.2d at 1116. While facts may exist from which a reasonable jury could conclude that an employer's business decision was so lacking in merit as to call into question its genuineness, plaintiffs have pointed to no such facts in this case. *See id.* Walsh testified that he hoped that UPG could improve profits because UPG physicians had their own patient base, and that Mattox was not doing enough to get patients. Therefore, putting Mattox on UPG's payroll would undermine the reason that Walsh though UPG could increase CHAPS' profitability.

Third, plaintiffs claim that there is evidence from which a reasonable jury could conclude that Mattox and Marvelli were fired because of their conflict with Huie.

As an initial matter, plaintiffs do not, and could not, argue that the disparate treatment between them and Huie is evidence of pretext because Huie, Mattox, and Marvelli were not similarly situated. Huie was no longer working at CHAPS. He had resigned and was working as a consultant at SIUH in order to reconcile billing problems. Moreover, according to plaintiffs, Huie was "indispensable" because he was in charge of billing, and CHAPS was facing an audit from Medicare.

Rather, plaintiffs argue that, since Huie was indispensable to SIUH and since he had an irreconcilable conflict with plaintiffs, that SIUH decided to terminate plaintiffs in order to eliminate the conflict with Huie. Even assuming plaintiffs are correct that Huie was indispensable, the evidence shows that the conflict between Huie and plaintiffs had been reconciled. Defendants had eliminated Huie's contact with plaintiffs by terminating his employment with CHAPS, retaining him only as a consultant at SIUH's offices, and prohibiting him from returning to CHAPS unescorted. While plaintiffs complained when Huie appeared unescorted one time, this does not support the conclusion that the solution attempted by SIUH was so unworkable that SIUH decided to terminate plaintiffs in order to keep Huie.

Fourth, plaintiffs claim that SIUH's failure to comply with CHAPS's policy regarding termination of employees is evidence of pretext. Under 1.1b of CHAPS' Personnel Policy and Procedure, if the reorganization or restructuring of CHAPS causes the elimination of certain jobs, employees will be given at least one month's notice unless funds do not allow for such notice. In this case, plaintiffs' jobs were not eliminated because of a restructuring. Rather, the same positions continued to exist, but SIUH changed staffing patterns by replacing plaintiffs with UPG physicians for the economic purpose of increasing revenue. Thus, 1.1a of the Personnel Policy and Procedure, which requires that as much notice as possible be given when management terminates "employment due to changes in staffing patterns, reduction in work force or for budgetary or other economic reasons" applies. Moreover, even if defendants failed to follow termination procedures, this does not support a discrimination claim because there is no evidence that this procedure was applied differently to protected and non-protected employees. *See Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 923 (2d Cir.1981); *Eng v. Beth Israel Medical Center,* 1995 WL 469704 *3–*4 (S.D.N.Y.1995).

Finally, plaintiffs argue that pretext can be inferred from the facts that Walsh never informed them that CHAPS was losing money, that CHAPS made offers to hire the interns shortly before terminating Mattox and Marvelli, that Walsh had repeatedly stated that CHAPS was going to expand its business and make a lot of money, and that UPG is affiliated with SIUH. However, as discussed below, the interns cannot show that they were offered employment, and the argument that Walsh never discussed CHAPS' financial problems is contradicted by the testimony of Mattox and Marvelli that Walsh told them they were being fired because CHAPS was "hemorrhaging financially." Mattox Depo. 194–95; Marvelli Depo. 23. Moreover, Walsh's claim that CHAPS was going to expand and make a lot of money supports his asserted reason that he was going to take the company in a new direction and make it more profitable by bringing in physicians who were more focused on bringing in patients. Finally, it is unclear how the fact that UPG was affiliated with SIUH is evidence of pretext. That SIUH sought to replace the physicians of a clinic it had just acquired with physicians affiliated with SIUH, whom SIUH knew had a

history of profit-making, is a legitimate business decision.

**Interns' Federal Claims**

 Gardner, Mickle, and Morales have failed to state a hostile work environment claim under Title VII or § 1981 because they were not employees. It is undisputed that Gardner, Mickle, and Morales received no salary and no benefits, and "[b]ecause the absence of either direct or indirect economic remuneration or the promise thereof is undisputed in this case, ... [Gardner, Mickle, and Morales were] not [CHAPS] employee[s] within the meaning of Title VII and thus ... [their] discrimination claim under that statute must fail." *O'Connor v. Davis,* 126 F.3d 112, 116 (2d Cir.1997), *cert. denied* 522 U.S. 1114, 118 S.Ct. 1048, 140 L.Ed.2d 112 (1998); *see also Hollander v. Sears, Roebuck & Co.,* 450 F.Supp. 496 (D.Conn.1978) (holding that an applicant to a student intern program could not state a § 1981 claim because the program did not have the indicia of an employment contract).

The interns argue that they are entitled to bring a hostile work environment claim because, at some point, they were promised future economic benefits, and that they were "wrongfully terminated" because they were promised a job and were not kept on at the end of the internship. Both these claims fail because plaintiffs cannot raise an issue of fact that they were ever promised employment. Nothing in the testimony of Morales, upon which plaintiffs rely, establishes an issue of fact contradicting the undisputed fact that they knew there was no guarantee of a job. Morales testified that Brown–Murray told the head of the internship program that, if CHAPS needed a medical assistant and if the interns were capable of doing the job, then she could hire them. This is not a promise of employment to the interns.

**Plaintiffs' State Law Claims**

Plaintiffs withdraw their intentional infliction of emotional distress claim in their Second Amended Complaint. Having dismissed all plaintiffs' federal claims, this court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. *See Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001). Therefore, plaintiffs' hostile work environment and retaliation claims against Huie, Appel, CHAPS, and SIUH under the NYSHRL and the NYCHRL, as well as their assault and battery claim against Huie, are dismissed without prejudice.

### Conclusion

In sum, defendants' motion for summary judgment on all of plaintiffs' federal claims is granted. Having dismissed all federal claims with prejudice, the court declines to exercise supplemental jurisdiction over the plaintiffs' state law claims, and dismisses them without prejudice. The Clerk of Court is directed to enter judgment in favor of defendants.

**SO ORDERED.**